T.C. Memo. 2013-131

UNITED STATES TAX COURT

JAMES S. CALLAHAN AND CAROL S. CALLAHAN, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 13859-10.                           Filed May 22, 2013.

P-W was facing foreclosure on two pieces of real property.
She discussed the matter with a promoter of certain sale-leaseback
transactions who informed P-W that the transactions could save her
properties from foreclosure.  P-W entered into the transactions, under
which:  (1) P-W sold each property to the promoter's designee and
leased the property back for a year with an option to purchase the
property upon expiration of the lease, (2) the loan on the first property
(Florida property) was fully paid, (3) the loan on the second property
(New Jersey property) was partially paid, and the balance of the loan
was forgiven, (4) P-W's payment of rent on the Florida property was
prepaid using proceeds of the sale of that property, (5) P-W's
payment of rent on the New Jersey property was prepaid in part using
the proceeds of the sale of that property.  Ps now claim that the
promoter defrauded P-W on the sale of the New Jersey property and
that the sale is therefore not a sale for Federal income tax purposes.
Ps note that a New Jersey court has since voided the sale of the New
Jersey property.  Ps also claim that the amount that R determined that

[*2] P-W realized on each sale was less than the amounts that P-W actually realized.

Held: The sale of the New Jersey property was a sale for Federal income tax purposes.

Held, further, P-W realized both capital gain income and discharge of indebtedness ordinary income on the sale of the New Jersey property, in the amounts indicated.

Held, further, P-W realized gain on the sale of the Florida property in the amount indicated.

Held, further, Ps are liable for an accuracy-related penalty under I.R.C. sec. 6662(a).

Mark K. Silver and Sheila Mints, for petitioners.

Erik M. Sternberg and Patricia Young Taylor, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

LARO, Judge: Respondent determined a $269,644 deficiency in petitioners' 2007 Federal income tax and a $53,929 accuracy-related penalty under section 6662(a).[1] Respondent's amended answer alleges that the deficiency is

---

[1]Unless otherwise indicated, section references are to the Internal Revenue Code in effect for the year in issue, and Rule references are to the Tax Court Rules of Practice and Procedure, and dollar amounts are rounded.

[*3] $417,394 (an increase of $147,750) and that the accuracy-related penalty is $83,479 (an increase of $29,550). Respondent's increased amounts relate solely to the sale of the New Jersey property discussed below, the tax effects of which were not reflected in the notice of deficiency.

We decide the following issues:

1.  whether Carol S. Callahan realized income on the sale of two pieces of real property. We hold she did to the extent stated;

2.  whether petitioners may deduct charitable contributions and qualified residence interest in amounts greater than respondent allows. We hold they may to the limited extent stated; and

3.  whether petitioners are liable for the accuracy-related penalty under section 6662(a). We hold they are.[2]

---

[2]Petitioners initially challenged respondent's determinations that they failed to report $629 of gambling winnings and $2,676 of wages and that they were not entitled to deduct $5,707 of residence mortgage interest and $7,661 of State and local income taxes. We reject respondent's determination as to the gambling winnings because the parties have since stipulated that petitioners did report the $629 as income. We sustain respondent's determinations as to the wages and to the referenced deductions because petitioners have advanced no argument in brief challenging those determinations. See Mendes v. Commissioner, 121 T.C. 308, 313-314 (2003) (noting that arguments not advanced on brief may be considered abandoned); Nicklaus v. Commissioner, 117 T.C. 117, 120 n.4 (2001) (same).

FINDINGS OF FACT

**[*4]** I.　　Preliminaries

Some facts were stipulated, and we incorporate the parties' stipulated facts and their accompanying exhibits into our findings.  Petitioners resided in New Jersey when they filed the petition.  They filed a joint Federal income tax return for 2007.

Petitioners provided the Court with a certified copy of a New York State court opinion and order showing that Ronald Losner was disbarred in 1995, and they ask the Court to take judicial notice of his disbarment.  We will do so.  See Fed. R. Evid. 201 (a), (b), and (c) (providing that courts may take judicial notice of adjudicative facts that are not open to dispute because they are supported by sources whose accuracy cannot reasonably be questioned).  We note, however, that this fact is of little, if any, relevance to our decisions today.

II.　　Florida Property

　　A.　　Sale

Before August 31, 2007, Ms. Callahan owned a condominium in Palm Beach, Florida (Florida property).  The Florida property was encumbered by a $680,000 note (Fremont note) payable to Fremont Investment & Loan.  Ms. Callahan was personally liable on the Fremont note.

**[\*5]**  Ms. Callahan and her mother purchased the Florida property before 1986 as joint tenants with rights of survivorship.  Her mother died in 1986, and her mother's joint interest passed to Ms. Callahan by operation of law.  Ms. Callahan's basis in the Florida property was increased by $132,500 as a result of her mother's death.

At the start of 2007 Ms. Callahan was in default on the Fremont note and she received an unsolicited mailing from Mr. Losner through his controlled entity Real Estate International (REI).  The mailing offered to help individuals like Ms. Callahan save their real property from foreclosure.  Ms. Callahan telephoned REI and spoke with Mr. Losner, who recommended that she participate in a "lease buyback" program to save her Florida property.  Mr. Losner explained that the program involved his acquiring the Florida property from the lender through a "short sale", his then leasing the Florida property to Ms. Callahan for one year, and his then reconveying the property to Ms. Callahan at the end of the year.  Mr. Losner later introduced Ms. Callahan to his mother, Shirley Losner, who eventually became the purchaser of record of the Florida property.  Ms. Losner's involvement in the transaction was necessary because she had the required creditworthiness to obtain the requisite financing.

**[\*6]** Ms. Callahan voluntarily entered into the promoted transaction as to her Florida property. Under the transaction, she transferred that property to Ms. Losner on or about August 31, 2007. The HUD-1 Settlement Statement (Florida HUD-1) stated that the sale price was $1.5 million and indicated that the $1.5 million was paid primarily through Ms. Losner's payment of $318,612 and her financing of the balance with Washington Mutual Bank (Washington Mutual). But Ms. Losner never actually used any of her funds to acquire the Florida property. Instead, the $318,612 came from Robert Lucas and Charles Cueno. In early September 2007, Messrs. Lucas and Cueno respectively wired $268,000 and $50,612 (a total of $318,612) to the escrow account of Clear Title & Abstract, LLC (Clear Title Account), with the understanding that the wired funds would be repaid (with a premium) immediately after the sale closed. Washington Mutual wired the loan proceeds of $1,125,816 to the Clear Title Account on September 12, 2007.

The Florida HUD-1 shows that $934,591 of the sale proceeds was distributed as follows:

| [*7] | Charges to Ms. Callahan | Amount |
|---|---|---|
| | Payoff of Fremont note | $766,968 |
| | Ms. Callahan's settlement charges | 17,646 |
| | 2007 estimated tax | 24,268 |
| | 2006 taxes | 22,465 |
| | Ms. Callahan's closing cost contribution | 90,000 |
| | County taxes (1/01 to 9/07) | 13,244 |
| | Total | 934,591 |

The Florida HUD-1 also shows that $566,654 of the sale proceeds was to be distributed to Ms. Callahan.

The $566,654 was not actually distributed to Ms. Callahan. Instead, on September 12, 2007, $566,654 was transferred from the Clear Title Account to Mr. Cueno's escrow account. The money borrowed from Messrs. Lucas and Cueno was then immediately returned to them from that escrow account with a premium: $273,360 was disbursed to Mr. Lucas, and $54,811 was disbursed to Mr. Cueno. Of the remaining proceeds, $219,403 was disbursed to REI, and $19,080 was disbursed to Ms. Callahan.

B.    Lease

As part of the sale-leaseback transaction, Ms. Losner and Mr. Losner entered into a one-year residential lease (Florida lease) with Ms. Callahan. The Florida lease began on October 1, 2007, and ended on October 15, 2008, and

[*8] provided that Ms. Callahan would pay Mr. Losner monthly rent of $11,800.[3] All rent due under the Florida lease was prepaid using funds from the sale of the Florida property. Under the Florida lease, Ms. Callahan was responsible for all maintenance expenses related to the Florida property.

The Florida lease gave Ms. Callahan the option to purchase the Florida property at the end of the one-year term for $1.5 million, but Ms. Callahan could "at her option reduce the purchase price to an amount no less than the amount of the Landlord's mortgage, to wit $1,125,000 by remitting the difference to the Landlord." The Florida lease provided that in consideration for granting Ms. Callahan the option to purchase the Florida property and as a condition to the Florida lease, Ms. Callahan had to pay an option price of $80,000 at the signing of the lease. If Ms. Callahan eventually exercised the option, she would be responsible for paying all taxes and Ms. Losner's costs associated with the option purchase. If Ms. Callahan chose not to exercise the option, the Florida lease provided that she could extend the lease for six months, and if she paid an extension fee of $20,000, she could extend the lease for an additional six months.

---

[3]While the term of the lease is actually longer than one year, the parties refer to this lease as a one-year lease. So do we.

[*9] The Florida lease provided that the term of the lease could not exceed 24 months. Ms. Callahan never extended the lease or exercised the option.

III.    New Jersey Property

    A.    Sale

During all relevant times Ms. Callahan and her husband lived in a home in Montclair, New Jersey (New Jersey property). Ms. Callahan acquired the New Jersey property in 1998 from her father for $437,500. In December 2005 Ms. Callahan obtained a $1.4 million loan from Wall Street Mortgage, Inc. (Wall Street note), secured by the New Jersey property. Ms. Callahan was personally liable for the payment of the Wall Street note.

The Wall Street note was assigned to U.S. Bank, N.A. (U.S. Bank) in February 2007. At or about that time, the Wall Street note was in default for nonpayment, and the servicing agent, Select Portfolio Servicing (Select Portfolio), had issued to Ms. Callahan a delinquency notice. As of June 15, 2007, the amount due under the Wall Street note was $1,513,249, and interest was accruing daily at $298. Ms. Callahan made a payment of $14,093 to Select Portfolio on December 12, 2007. As of December 20, 2007, the amount due under the Wall Street Note was $1,555,242.

[*10] On February 5, 2007, U.S. Bank commenced an action in the Superior Court of New Jersey, Chancery Division in Essex County (Chancery Court), to foreclose its mortgage on the New Jersey property. Ms. Callahan first tried unsuccessfully to modify the loan and to refinance the New Jersey property. She then turned to Mr. Losner for help to avoid foreclosure of the mortgage on the New Jersey property. Mr. Losner negotiated with Select Portfolio for a short sale of the New Jersey property. He then informed Ms. Callahan that he would execute another "lease buyback" arrangement with her similar to what they did with the Florida property.

By a letter dated December 5, 2007, addressed to Ms. Callahan and "in response to * * * [her] request", Select Portfolio agreed to a "short sale" for $872,802 (short sale price) in full discharge of the Wall Street note. The agreement with Select Portfolio, which did not identify the would-be purchaser, required Ms. Callahan to turn over to Select Portfolio any surplus funds received in excess of the short sale price, which Select Portfolio would apply to reduce the principal balance of the Wall Street note. The agreement also required Ms. Callahan to waive her rights to any escrowed funds or refunds from prepaid expenses. Select Portfolio required that a copy of the HUD-1 Settlement Statement be faxed to it at least 48 hours before closing for its approval. The letter

[*11] stated the mortgage would be "discharged" and any foreclosure action against the New Jersey property would be dismissed upon the satisfaction of all terms under the short sale agreement. The letter stated that "no release of mortgage * * * [would] be provided" if Select Portfolio did not approve the HUD-1 Settlement Statement or if funds remitted through closing did not agree with the approved HUD-1 Settlement Statement.

On December 19, 2007, Ms. Callahan signed a contract to sell the New Jersey property to Mr. Losner's associate, Alon Wolkowitz, for $1.755 million. The contract stated that Mr. Wolkowitz paid a $438,750 deposit on the date the contract was executed. On December 20, 2007, Ms. Callahan executed a deed to transfer the New Jersey property to a trust for which she was the grantor and Melanie Wohl was the trustee. Immediately thereafter, Ms. Wohl, as trustee, transferred the New Jersey property to Mr. Wolkowitz for $1.755 million. The accompanying HUD-1 Settlement Statement (New Jersey HUD-1) showed a total contract price of $1.755 million, which Mr. Wolkowitz financed partly through a mortgage loan from Washington Mutual for $1,316,250. The New Jersey HUD-1 showed the following charges to Ms. Callahan:

**[*12]**

| Charges to Ms. Callahan | Amount |
|---|---|
| Payoff of Wall Street note | $872,802 |
| Deposit placed with Ms. Callahan | 438,750 |
| Ms. Callahan's settlement charges | 46,807 |
| Total | 1,358,359 |

After applying the charges, the New Jersey HUD-1 showed that $396,641 ($1,755,000 - $1,358,359) was the "Cash to Seller". As a result of the transaction, Ms. Callahan was relieved of all of her liability for the Wall Street note secured by the New Jersey property.

At closing Stefan Siminou, acting as the attorney and the closing agent for Washington Mutual, oversaw the disbursements of the loan proceeds. The following individuals appeared at the closing: Mr. Losner, Mr. Wolkowitz, Alyssa Azran, and an individual who purported to be Ms. Callahan. The loan proceeds were distributed in the following manner:

| Distributee | Amount |
|---|---|
| Siminou & Associates, P.C. | $2,800 |
| Pan Am Mortgage[1] | 22,224 |
| Select Portfolio Servicing | 872,802 |
| Equity Settlement Services, Inc.[2] | 64,044 |
| 1072 Victory Blvd. Corp.[3] | 100,000 |
| Real Estate International | 243,033 |
| Alyssa Azran | 250 |
| Total | [4]1,305,153 |

[*13] [1]PanAm acted as the mortgage broker in the transaction, and it received $22,224 as a commission.

[2]Mr. Losner was the principal owner of this entity.

[3]1072 Victory Boulevard was the listed address of REI, of Mr. Wolkowitz's employer, and of Ms. Losner.

[4]This is not the full $1,316,250 loan amount because the borrower paid the lender a fee in the amount of the difference.

Ms. Callahan signed a Form 1099-S, Proceeds from Real Estate Transactions, dated December 20, 2007, which stated that the sale price was $1.755 million. She also received a Substitute Form 1098, Mortgage Interest Statement, for 2007 from Select Portfolio. The Substitute Form 1098 showed that Ms. Callahan paid Select Portfolio $145,347 in mortgage interest and $714,497 in principal (a total of $859,844).

B.   Lease

As part of the sale-leaseback transaction, Ms. Callahan executed a Use and Occupancy Agreement (New Jersey lease) dated December 20, 2007, by which Mr. Wolkowitz agreed to lease the New Jersey property to Ms. Callahan for residential purposes for a term of 12 months. The 12-month period was from January 1, 2008, until December 31, 2008, and the stated monthly rent was $11,900. The New Jersey lease also stated that Ms. Callahan would pay an upfront fee of $80,000 and prepay $57,000 of rent.

[*14] The New Jersey lease required Mr. Wolkowitz to pay for certain utilities and maintenance expenses that were listed in the lease. The New Jersey lease also provided that Mr. Wolkowitz was entitled to reimbursement for the cost of carrying any homeowner's property insurance. If all of the New Jersey property was condemned or subject to a Government taking, Ms. Callahan's rights under the New Jersey lease would end on the date of the taking of title; if the property was partially condemned, Mr. Wolkowitz could cancel the lease and demand the return of the property with rent due to the cancellation date. In either case, Mr. Wolkowitz was entitled to the entire award of any taking, to which Ms. Callahan waived all claims. The New Jersey lease did not provide for any indemnification by Ms. Callahan against any loss Mr. Wolkowitz might suffer from a condemnation award being less than Mr. Wolkowitz's purchase price.

The New Jersey lease gave Ms. Callahan an option to purchase the New Jersey property at the end of the lease's one-year term at a price of $1.755 million. Ms. Callahan could at her option "reduce the purchase price to an amount no less than the amount of the * * * [Mr. Wolkowitz's] mortgage, to wit, $1,320,000.00 by remitting the difference to * * * [Mr. Wolkowitz]." As part of any such purchase of the New Jersey property, Ms. Callahan was responsible for paying any taxes and fees that Mr. Wolkowitz incurred in connection with the purchase. Ms.

**[*15]** Callahan could extend the lease for six additional months, in lieu of exercising her option, for a fee of $20,000.[4]

By September 2008 Ms. Callahan had defaulted on the New Jersey lease for nonpayment of rent. By a letter dated September 23, 2008, Mr. Wolkowitz demanded a payment of $12,308 (including late charges) to cure the default. Ms. Callahan wired that amount on September 26, 2008.

Ms. Callahan never extended the lease or exercised the option under the New Jersey lease. Petitioners continued to live at the New Jersey property.

C.    Chancery Court Proceedings

On April 2, 2009, JP Morgan Chase, N.A. (Chase), as successor to Washington Mutual and as the then-existing mortgage holder for the New Jersey property, commenced a foreclosure action in the Chancery Court. Chase alleged that Mr. Wolkowitz executed a nonpurchase money mortgage on the New Jersey property in favor of Washington Mutual on December 20, 2007, and had defaulted for failing to make the promised monthly mortgage payments as early as October 1, 2008. The Chancery Court eventually allowed Ms. Callahan to intervene and

---

[4]In evidence are two versions of the same lease but showing different option prices. Each version was signed by both parties to the lease. The second version of the lease indicated that the option price was $1,320,000 or $435,000 if Ms. Callahan remitted the difference. Ms. Callahan was unable to explain why there were two identical leases listing different option prices.

[*16] stayed the proceeding. Ms. Callahan alleged in her intervening complaint that title to the New Jersey property was taken from her by fraud and that Mr. Wolkowitz lacked a proper legal title to execute and convey the mortgage on the New Jersey property.

Ms. Callahan commenced a separate but related lawsuit against Mr. Wolkowitz alleging that he, Mr. Losner, Ms. Wohl, and Ms. Azran defrauded Ms. Callahan of valid title to the New Jersey property. Mr. Wolkowitz failed to answer Ms. Callahan's complaint in that lawsuit, and on March 21, 2011, the Chancery Court entered a default judgment against Mr. Wolkowitz (March 21 judgment). The March 21 judgment voided the transfer of the New Jersey property to the trust and the trust's transfer of the property to Mr. Wolkowitz, and it restored the legal title of the New Jersey property to Ms. Callahan subject to the Chase mortgage. The Chancery Court did not rule on the merits of Ms. Callahan's fraud claim and did not find any specific instances of fraud.

On April 28, 2011, Ms. Callahan remitted to Chase approximately $1.1 million and paid off the mortgage. Ms. Callahan funded the remittance with a new mortgage note of $700,000 and cash for the remaining amount.

**[\*17]** IV.     Ms. Callahan's Bank Accounts

At all relevant times Ms. Callahan had a personal bank account with TD Bank (TD Bank account). The deposits into that account during the relevant times were mainly monthly payments of $20,000 to $22,000 from a trust and the $19,080 that Ms. Callahan received from the Florida transaction. None of the other proceeds from either of the two property transactions was transferred to the TD Bank account.

Monthly transfers of $11,900 (the amount of monthly rent due under the New Jersey lease) were wired from the TD Bank account to another account beginning June 2008.

V.     Disputed Deductions

On their 2007 return petitioners claimed a deduction for $145,347 in residence mortgage interest paid on the Wall Street note. The payment of this interest was reported to them on the Substitute Form 1098 discussed above.

Petitioners also claimed a $1,300 deduction for cash charitable contributions. They aim to substantiate this deduction by way of a receipt reporting that they made $375 of charitable contributions.

**[*18]**                                           OPINION

I.    <u>Introduction</u>

Respondent argues that petitioners are taxable on Ms. Callahan's sale of both subject properties.  To that end, respondent asserts, Ms. Callahan voluntarily entered into the promoted sale-leaseback transactions as to the properties, she executed documents for the sale of the properties to avoid foreclosure, and she leased the properties in part with prepaid rent funded by loan proceeds from the sales.  Respondent concludes that Ms. Callahan realized $1.5 million and $1.755 million from the respective sales of the Florida property and the New Jersey property, as reported on the settlement statements.

Petitioners do not dispute that both the Florida property and the New Jersey property were in fact sold in 2007.  They argue that the Court should disregard the sale of the New Jersey property because, they state, the Chancery Court voided the sale ab initio.  They argue alternatively as to the sale of the New Jersey property (and argue exclusively as to the sale of the Florida property) that respondent's calculation of the amounts Ms. Callahan realized on each sale is too high. Petitioners argue that the amounts that Ms. Callahan realized as to the sale of the New Jersey property were (1) the $872,802 from the short sale of the New Jersey property and (2) the $177,198 of cancellation of indebtedness income with respect

[*19] to the forgiven portion of the Wall Street note. Petitioners argue that the amount that Ms. Callahan realized on the sale of the Florida property was $786,048, consisting of (1) the $766,968 of the Fremont note which was paid off with the sale proceeds, and (2) the $19,080 Ms. Callahan received.

We agree with respondent that each sale was a taxable event. We conclude, however, that the amounts that Ms. Callahan realized on each sale were less than respondent asserts.

## II.    Burden of Proof as to the Deficiency

We begin our analysis with a discussion of the burden of proof as to the deficiency. Generally, the Commissioner's determinations in a notice of deficiency are presumed correct, and taxpayers bear the burden of proving those determinations wrong.[5] Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). Where, however, a case involves unreported income and is appealable to the Court of Appeals for the Third Circuit, which is the case here absent a contrary written stipulation, see sec. 7482(b)(1)(A), the Commissioner must produce foundational evidence linking the taxpayers to the tax-generating activity in order

---

[5]The Commissioner bears the burden of proving any assertion that a deficiency is greater than that determined in the notice of deficiency. See Rule 142(a). Thus, respondent bears the burden of proving the increased deficiency that he seeks on account of Ms. Callahan's sale of the New Jersey property.

[*20] to benefit from the presumption of correctness as to those items. See

Anastasato v. Commissioner, 794 F.2d 884, 887 (3d Cir. 1986) (citing Gerardo v.

Commissioner, 552 F.2d 549, 554 (3d Cir. 1977), aff'g in part, rev'g in part and

remanding T.C. Memo. 1975-341), vacating and remanding T.C. Memo. 1985-

101.

Respondent's primary determination in the notice of deficiency involved

income from Ms. Callahan's sale of the Florida property. Respondent is entitled to

the presumption of correctness as to this determination because he has produced

foundational evidence linking Ms. Callahan to income from the transfer of the

Florida property. In evidence are (1) a Wage and Income Transcript from the

Internal Revenue Service, which shows that Clear Title issued Ms. Callahan a

Form 1099-S for 2007 reporting a sale of real estate property for $1.7 million, and

(2) a deed Ms. Callahan executed to transfer title of the Florida property to Ms.

Losner. The sale proceeds reported on the Form 1099-S formed the basis of

respondent's initial determination of deficiency, given that petitioners failed to

report any gain on the sale of the Florida property.

Respondent's remaining disputed determinations relating to the notice of

deficiency concern the disallowance of deductions claimed for charitable

contributions and qualified residence interest. The deficiency notice is naturally

[*21] entitled to a presumption of correctness as to these items. Petitioners thus bear the burden of proving the deficiency determination incorrect, absent an exception to the general rule. Petitioners point to the exception in section 7491(a) and ask the Court to place the burden of proof on respondent pursuant thereto. We need not decide whether that exception applies because the parties have provided sufficient evidence for us to decide the factual issues in dispute without regard to the burden of proof. See Knudsen v. Commissioner, 131 T.C. 185, 188 (2008) (citing Blodgett v. Commissioner, 394 F.3d 1030, 1039 (8th Cir. 2005), aff'g T.C. Memo. 2003-212). We decide those issues accordingly.

III.    Sales of Real Properties

        A.    Background

The Supreme Court has defined income as "undeniable accessions to wealth, clearly realized, and over which the taxpayers have complete dominion." Commissioner v. Glenshaw Glass Co., 348 U.S. 426, 431 (1955). For a cash basis taxpayer, gross income includes any amount that the taxpayer actually or constructively receives. Sec. 1.451-1(a), Income Tax Regs. Income not actually reduced to a taxpayer's possession is constructively received by a taxpayer in the year during which the income is credited to an account, set apart, or otherwise made available so that the taxpayer may draw upon it at any time. Sec. 1.451-2(a),

**[\*22]** Income Tax Regs. Income is not constructively received if its control is subject to substantial limitations or restrictions. Id.

B.    New Jersey Property

1.    March 21 Judgment

Petitioners argue that the March 21 judgment voided ab initio the transfers of title to the New Jersey property and that res judicata precludes this Court from recognizing Ms. Callahan's sale of the New Jersey property as a sale for Federal income tax purposes. Alternatively, petitioners argue, the Chancery Court's finding in the March 21 judgment of fraud as to the transfers of the New Jersey property allows Ms. Callahan to rescind her contract to sell that property. Petitioners conclude that the transfers of the New Jersey property are considered never to have happened, with Ms. Callahan retaining title to that property at all times.

We disagree with petitioners' argument and conclusion. Under the doctrine of res judicata, or claim preclusion, a final judgment on the merits in a prior suit bars a second suit involving the same cause of action and the same parties or their privies. Parklane Hosiery Co., Inc. v. Shore, 439 U.S. 322, 327 n.5 (1979). Because respondent was neither a party nor in privity with a party to the

**[*23]** proceeding in the Chancery Court, petitioners' reliance on res judicata is misplaced.

Nor from a factual point of view did the March 21 judgment void the sale of the New Jersey property ab initio as petitioners claim. The State court entered a default judgment against Mr. Wolkowitz after he failed to answer Ms. Callahan's complaint, deeming the transfers to be void subject to Chase's mortgage and the resulting mortgage lien. The judgment did not state that the transfers were "void ab initio". The fact that the Chancery Court voided the transfers subject to Chase's existing mortgage suggests that the court was mindful that voiding the transactions from the beginning could nullify all transactions that followed the initial transfers, including the mortgaging of the property by Chase as a successor to Washington Mutual. Implicit in the Chancery Court's order voiding the transfers subject to the existing mortgage was that Chase's mortgage interest in the property was valid. As a corollary, the Chancery Court did not void the transfers from the beginning.

For the same reason, the March 21 judgment does not allow Ms. Callahan to equitably rescind her contract to sell the New Jersey property as a fraudulent conveyance. Under New Jersey law, equitable fraud provides a basis for a party to rescind a contract, which "voids the contract <u>ab</u> <u>initio</u>, meaning that it is

[*24] considered 'null from the beginning' and treated as if it does not exist <u>for any purpose</u>." <u>First Am. Tit. Ins. Co. v. Lawson</u>, 827 A.2d 230, 237 (N.J. 2003) (emphasis added) (quoting Black's Law Dictionary 1568 (7th ed. 1999)). The March 21 judgment, however, was not predicated on a finding of equitable fraud. Nor did the Chancery Court specifically make any finding of fact or render any opinion on the merits of the fraud claim.

We shall recognize Ms. Callahan's sale of the New Jersey property as such and turn to determine the amounts that she realized on that sale.

### 2. Capital Gain Income

According to the New Jersey HUD-1, the contract sale price was $1.755 million. Of that amount, $1,316,250 was financed through a loan with Washington Mutual, and Mr. Wolkowitz purportedly paid the rest in cash. On the basis of the evidence before us, including her bank statements, we find that Ms. Callahan did not actually or constructively receive the portion of the contract price Mr. Wolkowitz purportedly paid in cash, and thus she did not receive income to that extent.

As to the $1,316,250 in loan proceeds, it is undisputed that Ms. Callahan realized at least $872,803 that was applied to the Wall Street note. We also find that Ms. Callahan realized an additional $46,807 from her constructive receipt of

[*25] the portion of the sale proceeds that was used to pay the settlement charges shown on the New Jersey HUD-1 on her behalf.  See sec. 1.451-2(a), Income Tax Regs.  While the "List of Checks" that Mr. Siminou provided does not show he made a disbursement out of the loan proceeds to pay the settlement charges, we find that one of the entities related to Mr. Losner paid the settlement charges on Ms. Callahan's behalf in order to close the transaction.

We also find that Ms. Callahan realized an additional $57,000 from the constructive receipt of the rent prepaid on her behalf.  In addition to the New Jersey lease and the list of checks from Mr. Siminou's closing files, we note a letter faxed to Ms. Azran dated April 30, 2008, in which Ms. Callahan wrote:

> I am responding to the selection of payments towards use and occupancy of my [New Jersey] property * * *.  After working numbers, I have decided to credit the $9400 remaining towards May's use and occupancy.  Please tell me how to send the balance of $2500 remaining for use and occupancy and all future payments.

It is apparent from the letter that by "credit the $9,400 remaining towards May's use and occupancy", Ms. Callahan was referring to the $57,000 prepaid rent. Because $57,000 of rent was prepaid, Ms. Callahan was not required to make rent payments for the first four months in 2008 ($11,900 x 4 = $47,600).  However, the remaining prepaid amount of $9,400 ($57,000 - $47,600) would be insufficient to pay for the entire month of May.  This explains why Ms. Callahan asked for a

[*26] $9,400 credit towards May's rent and paid only $2,500 in addition to the credit ($9,400 + $2,500 = $11,900).[6] Ms. Callahan testified that she was told there was "extra money available in the[] transactions" to apply towards rent. Together, the evidence shows that $57,000 in rent was prepaid and it came from Mr. Wolkowitz's loan proceeds that went to the entities Mr. Losner ostensibly either owned or controlled (i.e., REI, Equity Settlement Services, Inc., and 1072 Victory Blvd. Corp.).

We further find that Ms. Callahan did not realize any part of the $80,000 fee referred to in the lease from the sale of the New Jersey property. The only evidence relating to the fee is the provision in the New Jersey lease, and there is no evidence showing the fee was actually paid.

We further find that Ms. Callahan did not actually or constructively receive any other amount from the New Jersey transaction. Ms. Callahan's bank statements do not show she actually received any of the proceeds of the New Jersey sale; indeed the evidence shows the loan proceeds were distributed to other individuals and entities unrelated to Ms. Callahan. Further, if Ms. Callahan knew that there were more proceeds available from the sale and that they were being

---

[6]The bank statements of the TD Bank account show $2,500 was transferred out of the account on April 30, 2008.

[*27] held by Mr. Losner in trust for her use, she would not have asked in her letter to Ms. Azran that she be credited only $9,400. The fact that Ms. Callahan thought she only had $57,000 credit in her account shows there was nothing else from the sale of the New Jersey property that was "set apart for * * * [her], or otherwise made available so that * * * [she] may draw upon it at any time". See sec. 1.451-2(a), Income Tax Regs. Moreover, Ms. Callahan began making her monthly rent payments of $11,900 in June 2008. If there were more money left from the New Jersey transaction (or even from the Florida transaction) set aside for Ms. Callahan and she knew about it, it would make little sense for her to start making monthly rent payments as early as June 2008.

To recapitulate, Ms. Callahan realized the following amounts from her sale of the New Jersey property:

| | |
|---|---|
| Applied to Wall Street note | $872,803 |
| Settlement charges | 46,807 |
| Prepaid rent | 57,000 |
| Total | 976,610 |

### 3. Ms. Callahan's Basis in the New Jersey Property

The parties stipulated that Ms. Callahan's basis in the New Jersey property immediately before the sale was $437,500. The basis reduction required under section 108(h)(1) does not apply because, as we will explain more fully below,

[*28] petitioners may not exclude any portion of the discharge of her mortgage indebtedness under section 108(a)(1)(E). Further, no adjustment under section 1016 is required.[7] Accordingly, Ms. Callahan's adjusted basis in the New Jersey property for determining the amount of her gain under section 1001(c) is $437,500. See also secs. 1(h), 1221, 1222, 1223.

### 4. Ordinary Income From Cancellation of Indebtedness

Gross income includes the amount of discharged debt. Sec. 61(a)(12). Thus, in addition to her capital gain income, Ms. Callahan also realized ordinary income from the cancellation of a portion of the Wall Street note, unless a statutory exclusion applies otherwise. See secs. 61(a)(12), 108(a); sec. 1.1001-2(a)(2), Income Tax Regs.

In their brief petitioners appear to be claiming that any debt cancellation income is considered capital gain income. The amount realized on the sale of property that secures a recourse liability, however, does not include amounts that are (or would be if realized and recognized) income from the discharge of that

---

[7]Petitioners asserted for the first time on brief that Ms. Callahan's basis in the New Jersey property includes $265,000 in litigation costs that she incurred to regain title to the property. Other than Ms. Callahan's vague and conclusory testimony at trial that she spent over $100,000 in litigation costs to regain title to that property, the record contains no evidence to substantiate petitioners' assertion. Moreover, we note, any such fees would have been incurred by Ms. Callahan in a taxable year after the sale of the property in 2007.

[*29] liability under section 61(a)(12). Sec. 1.1001-2(a)(2), Income Tax Regs.; see also Commissioner v. Tufts, 461 U.S. 300, 318-320 (1983) (O'Connor, J., concurring) (noting Commissioner's longstanding position reflected in section 1.1001-2, Income Tax Regs.). Income realized on the discharge of such debt is ordinary income taxed at ordinary rates.

The total amount due on the recourse note on the date of the sale was $1,555,242,[8] and the lender accepted $872,803 in settlement of that debt. The lender thus discharged $682,439 of the debt ($1,555,242 - $872,803). Ms. Callahan realized ordinary income of $682,439 on that discharge unless one or more of the exclusions under section 108(a) applies. Petitioners argue only that the exclusion for "qualified principal residence indebtedness" applies. See sec. 108(a)(1)(E), (h).[9]

"Qualified principal residence indebtedness" means indebtedness incurred in acquiring, constructing, or substantially improving a taxpayer's principal

---

[8]We observe that this amount included accrued mortgage interest of $142,241. Select Portfolio reported on the Substitute Form 1098 for 2007 that Ms. Callahan paid $145,347 in mortgage interest, which subsumes the $142,241 mortgage interest we determine.

[9]Sec. 108(a)(1)(E) and (h) was added by the Mortgage Forgiveness Debt Relief Act of 2007, Pub. L. No. 110-142, sec. 2(a) and (b), 121 Stat. at 1803, and applies to discharges of indebtedness on or after January 1, 2007.

[*30] residence to the extent it does not exceed $2 million for married individuals filing a joint return. Secs. 108(h)(2), 163(h)(3)(B). Such acquisition indebtedness that was subsequently refinanced continues to be qualified indebtedness for the purpose of section 108(h). See sec. 163(h)(3)(B). A taxpayer claiming the exclusion must reduce his or her basis in the principal residence by the amount excluded from gross income under section 108(a)(1)(E). Sec. 108(h)(1).

Petitioners claim that a portion of the Wall Street note, $350,000, was attributable to "qualified principal residence indebtedness" under section 108(a)(1)(E). The record before us does not support such claim. There is no evidence showing any part of Ms. Callahan's original 1998 purchase price of $437,500 was financed with a mortgage loan that was then refinanced with the Wall Street note in December 2005. The record also does not show Ms. Callahan used any of the proceeds from the Wall Street note to finance the construction or substantial improvement of the New Jersey property or to refinance a debt that she incurred for such construction or improvement. Thus, the record does not support a conclusion that any portion of the Wall Street note was qualified principal residence indebtedness within the meaning of section 108(a)(1)(E). See sec. 108(h)(2).

[*31] Accordingly, petitioners must recognize $682,439 in ordinary income for 2007 from the discharge of that portion of Ms. Callahan's Wall Street note.

### C. Florida Transaction

#### 1. Amount Realized

Petitioners argue that Ms. Callahan realized from the sale of the Florida property an amount equal to the sum of the satisfaction of her Fremont note, $766,968, and the $19,080 she received. Respondent counters that Ms. Callahan realized the $1.5 million shown on the HUD-1 settlement statement plus the rent prepaid on her behalf under the Florida lease.

The recording stamp on the deed and the Florida HUD-1 show a contract price of $1.5 million. Of that amount, $1.125 million was financed with Ms. Losner's mortgage loan from Washington Mutual and the rest ostensibly with cash. But the evidence shows that Ms. Losner's purported cash contribution to the transaction was in fact only the proceeds of the two short-term loans from Messrs. Lucas and Cueno that were immediately repaid to them after closing. Thus, Ms. Losner never contributed any cash of her own, and Ms. Callahan did not receive income to that extent. Correspondingly, the issue is how much of the proceeds from Ms. Losner's mortgage note, i.e., $1,125,816, should be included in the amount Ms. Callahan realized.

[*32] Of the loan proceeds, $766,968 was used to pay off Ms. Callahan's Fremont note, and $19,080 was actually disbursed to her. Thus it cannot be disputed--in fact, petitioners have conceded on brief--that they realized at least these amounts.

At trial Ms. Callahan admitted that the rent for the Florida property was prepaid for the whole year and that she did not pay it out of her own pocket. Thus, the prepaid rent could only have come from the $219,403 of the loan proceeds from Ms. Losner's mortgage note that was distributed to Mr. Losner's REI. Because the greater weight of the evidence shows that $141,600 was paid to REI and credited to Ms. Callahan's account in 2007 to prepay 12-month's rent for the Florida property, we find that Ms. Callahan constructively received that amount from the sale of the Florida property. See sec. 1.451-2(a), Income Tax Regs.

Petitioners argue that the prepaid rent should not be treated as constructively received by Ms. Callahan because, as she claims, she did not have access to the Florida property after the parties completed the transaction. This argument is a red herring. The evidence shows that $141,600 was credited to Ms. Callahan's account and unconditionally set apart for her to prepay 12 months of rent at the commencement of the Florida lease in 2007. Even if, for the sake of argument, Ms. Callahan were subsequently denied access to the Florida property when she had a right to access under the Florida lease, this would have nothing to

[*33] do with her constructive receipt of the amount in prepaid rent. Ms. Callahan was entitled to $141,600 of the loan proceeds upon the sale of the Florida property in 2007, and Mr. Losner or Ms. Losner applied those proceeds toward her obligation to pay rent under the Florida lease.

As to the charges to Ms. Callahan shown on the Florida HUD-1, the evidence establishes that she constructively received the following items of income: $17,646 in settlement charges to her and $13,244 of county real estate tax she owed for January 1 through September 7, 2007, that was paid on her behalf. The Florida HUD-1 shows that the settlement charges imposed on Ms. Callahan included different types of fees and the title insurance premium paid to Clear Title--an entity not implicated in petitioners' fraud allegation--as well as the deed transfer tax paid to the State. Because the record does not show that petitioners paid these settlement charges or the prorated county tax out of their own pocket, we infer that they were paid using Ms. Losner's loan proceeds for Ms. Callahan's benefit. Accordingly, we conclude that they constituted Ms. Callahan's constructive receipt of income. Cf. sec. 1001(b)(2).

With respect to "2007 ESTIMATED TAX", "SELLER CLOSING COST CONTRIBUTION", and "2006 TAXES", the record does not provide any information as to what these payments were and whom they were paid to. Without

[*34] having any reasonable factual basis in the record to at least infer that these were payments actually made for Ms. Callahan's benefit, we decline to conclude that she constructively received any income relating thereto.

On the $80,000 option price stated in the Florida lease, there is no evidence showing the $80,000 option price was ever paid; and even if it was paid, there is no evidence showing it was paid with any of the sale proceeds.

To recapitulate, Ms. Callahan realized the following amounts in 2007 on the sale of the Florida property. See sec. 1001(b).

| | |
|---|---|
| Payoff of Fremont note | $766,968 |
| Disbursement | 19,080 |
| Prepaid rent | 141,600 |
| Settlement charges | 17,646 |
| County taxes | 13,244 |
| Total | 958,538 |

2. Ms. Callahan's Basis in the Florida Property

We next determine Ms. Callahan's basis in the Florida property at the time of the sale. The parties agree that Ms. Callahan's basis was increased by $132,500 when her mother died. The parties dispute whether Ms. Callahan's basis was $92,500 before her mother died as petitioners assert. We conclude that it was.

Ms. Callahan testified that she and her mother together paid $185,000 in the aggregate for the Florida property, that she provided 50% of the downpayment,

[*35] and that she made 50% of all mortgage payments. On the basis of that testimony, Ms. Callahan now claims the additional basis of $92,500. We find Ms. Callahan's testimony on this matter credible. Even though the Florida property was purchased years ago, one does not usually forget how much he or she paid for a house. Thus, we find that there is a sufficient evidentiary foundation for us to conclude that Ms. Callahan had an additional $92,500 basis in the Florida property. We conclude that Ms. Callahan's adjusted basis in the Florida property for determining the amount of her gain under section 1001(c) was $225,000 ($132,500 + $92,500) when she sold it. See sec. 1016; see also secs. 1(h), 1221, 1222, 1223.

IV.  Deductions

A.  Charitable Contributions

The parties stipulated that petitioners claimed deductions for cash charitable contributions of $1,300 and provided a receipt for $375 to substantiate that claim. Respondent concedes that petitioners may deduct $375 of the $1,300 as a charitable contribution. Because nothing in the record shows that petitioners have met the requirements under section 170 and the regulations under that section to substantiate a deduction in excess of $375, we hold that petitioners' deduction for cash charitable contributions is limited to $375.

**[\*36]** B.     Qualified Residence Interest Deduction

Respondent disallowed petitioners' mortgage interest expense deduction of $145,347. The parties have stipulated that petitioners substantiated the payment of $145,347 on which petitioners based the claimed deduction. We understand respondent to continue to argue that petitioners are not entitled to deduct any of that amount under section 163(h).

Deductions, including those for qualified residence interest, are a matter of legislative grace. New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440 (1934). The burden is upon the taxpayers to prove that they are entitled to the deductions claimed. INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992).

Under section 163(h)(2)(D), "qualified residence interest" is deductible. The term "qualified residence interest" means any interest paid or accrued during the taxable year on acquisition indebtedness or home equity indebtedness with respect to a qualified residence. Sec. 163(h)(3)(A). The term "acquisition indebtedness" means any debt that is secured by the residence and that is incurred to acquire, construct, or substantially improve a taxpayer's qualified residence. Sec. 163(h)(3)(B). Refinanced acquisition indebtedness continues to be acquisition indebtedness for the purposes of section 163(h)(3)(B). The term "home equity indebtedness" means any debt secured by the qualified residence to

**[\*37]** the extent the aggregate amount of the indebtedness does not exceed the taxpayer's equity in the residence (i.e., the fair market value of the qualified residence reduced by the acquisition indebtedness of the residence). Sec. 163(h)(3)(C). The aggregate amount that may be treated as acquisition indebtedness for any period is generally limited to $1 million, and the aggregate amount that may be treated as home equity indebtedness for any period is generally limited to $100,000. Sec. 163(h)(3)(B)(ii), (C)(ii).

Because Ms. Callahan acquired the New Jersey property from her father in 1998 and obtained the $1.4 million Wall Street note in 2005, the Wall Street note could not be acquisition indebtedness on the basis that it was incurred to acquire the New Jersey property. As we discussed earlier, the record does not show Ms. Callahan originally purchased the property with a loan that was later refinanced by the Wall Street note. Petitioners also have failed to show that any of the proceeds from the Wall Street note were used to finance the construction or substantial improvement of any part of the New Jersey property or were used to refinance a debt incurred for such construction or improvement. Thus, petitioners have failed to show that any portion of the Wall Street note was acquisition indebtedness under section 163(h)(3)(B).

**[\*38]** The Wall Street note, however, was home equity indebtedness within the meaning of section 163(h)(3)(C). The note was secured by the New Jersey property. The parties do not dispute that the New Jersey property was a qualified residence, and the record supports such a finding. See sec. 163(h)(4)(A). It also appears that the amount of the Wall Street note did not exceed Ms. Callahan's equity in the property. In any event, the aggregate amount that may be treated as home equity indebtedness is limited to $100,000, well below the principal amount of the note. Accordingly, we find that petitioners are entitled to deduct $145,347 of mortgage interest paid but only to the extent that it is attributable to $100,000 of the Wall Street note. The parties should determine this amount in their Rule 155 computation.

V.    Accuracy-Related Penalty

Respondent determined that petitioners are liable for an accuracy-related penalty because they substantially understated their income tax or, alternatively, were negligent or disregarded rules or regulations. See sec. 6662(a) and (b)(1) and (2). Petitioners will have a substantial understatement of income tax if the amount of the understatement exceeds the greater of 10% of the tax required to be shown on their 2007 return or $5,000. See sec. 6662(d)(1)(A). Alternatively, we will sustain respondent's determination to impose an accuracy-related penalty if we

**[\*39]** decide that petitioners failed to make a reasonable attempt to comply with provisions of the internal revenue laws or disregarded rules or regulations by acting carelessly, recklessly, or with intentional disregard. Sec. 6662(c); sec. 1.6662-3(b)(1) and (2), Income Tax Regs. Only one accuracy-related penalty may be imposed for a given portion of an underpayment even though that portion implicates more than one form of misconduct described in section 6662. Sec. 1.6662-2(c), Income Tax Regs.

Under section 7491(c), respondent bears the burden of production with respect to petitioners' liability for the accuracy-related penalty. To meet this burden, respondent "must come forward with sufficient evidence indicating that it is appropriate to impose the relevant penalty." See Higbee v. Commissioner, 116 T.C. at 446. Once respondent sustains his burden of production, the burden of proof falls upon petitioners (except for the increased portion of the accuracy-related penalty raised in the amended answer). See id. at 447, 449. Petitioners may satisfy their burden of proving that the penalty is unwarranted by establishing an affirmative defense such as reasonable cause or substantial authority. See id. at 446-447.

Respondent has met his burden of production by showing that petitioners acted negligently when they failed to ascertain the extent of their tax liabilities

[*40] resulting from the New Jersey transaction and the Florida transaction.[10] With respect to the New Jersey transaction, the record shows petitioners received a Substitute Form 1098 which reported that during 2007 Ms. Callahan had paid $145,347 of interest and $714,497 of loan principal as to that property. Although petitioners claimed the mortgage interest deduction consistent with what was reported on the Substitute Form 1098, they did not report the payoff of the principal balance of their mortgage that was also stated on that document. This type of cherrypicking shows petitioners were acting with the intentional disregard of their responsibility to comply with the Federal tax statutes.

With respect to the Florida transaction, petitioners claim they never received a Form 1099-S or a Form 1098. But Ms. Callahan must have been aware that the Fremont note was paid off after the Florida transaction was completed. To be sure, the fact that Ms. Callahan was relieved of her mortgage liability should have at least prompted her to inquire whether the immediate and direct economic benefit that she enjoyed was taxable. Further, the Substitute Form 1098 for her New Jersey property should have raised questions about the taxability of the

---

[10]Respondent's burden of production also is met if the Rule 155 computation shows that petitioners had a substantial understatement of income tax. See, e.g., Jarman v. Commissioner, T.C. Memo. 2010-285, 100 T.C.M. (CCH) 599, 602 (2010); Prince v. Commissioner, T.C. Memo. 2003-247, 86 T.C.M. (CCH) 283, 288 (2003).

[*41] Florida transaction. Her failure to ask the necessary questions is indicative of her negligence.[11]

We now turn to petitioners' claimed defense. Their sole defense in brief is that they had reasonable cause and acted in good faith as to their 2007 return because Ms. Callahan did not understand that the transactions resulted in the transfer of title to the properties. The record leads us to find to the contrary. Ms. Callahan knew that the transactions involved the "sales" of her properties. To be sure, Ms. Callahan was seeking a way to avoid foreclosure of the mortgages on her properties and knew the "lease buyback" program that Mr. Losner offered involved "short sale" of her properties and her signing various documents. Moreover, petitioners were able to enjoy the immediate impact of the economic benefits resulting from the transactions: one day Ms. Callahan was facing foreclosure and the next day she was able to keep her properties with rent prepaid and not having to worry about making mortgage payments for an entire year. Even if she discerned in September 2008 that she was possibly a victim of fraud, that fact would not excuse petitioners' reporting responsibility when they filed their Federal income tax return months earlier.

---

[11]Petitioners also acted negligently when they failed to report certain items of income and claimed deductions without maintaining adequate books and records to substantiate their amounts. See sec. 1.6662-3(b), Income Tax Regs.

**[*42]** We sustain respondent's determination that the accuracy-related penalty is applicable to the full amount of the deficiency (including the portion asserted in the amended answer).

VI.    Epilogue

We have considered all of the parties' arguments, and all arguments not discussed herein have been rejected as moot, irrelevant, or without merit.

To reflect the foregoing,

Decision will be entered

under Rule 155.